IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ACTUATE CORPORATION,<br><br>　　　　Plaintiff,<br><br>　v.<br><br>CONSTRUCTION SPECIALTIES, INC.,<br><br>　　　　Defendant.<br>_____/ | No. C 10-4444 CW<br><br>ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT, Docket No. 31, AND GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR LEAVE TO AMEND ITS COMPLAINT, Docket No. 34 |

　　　Defendant Construction Specialties, Inc. (CS) moves for partial summary judgment as to Plaintiff Actuate Corporation's claims based on CS's alleged failure to pay a license transfer fee, pursuant to its agreement to license Actuate software, when it transferred that software from one server to another.  Docket No. 31.  Actuate opposes the motion for partial summary judgment and moves for leave to amend its complaint to add allegations based on facts purportedly uncovered during the course of discovery.  Docket No. 34.  Defendant opposes that motion.  Having considered all of the parties' submissions and oral argument, the Court grants CS's motion for partial summary judgment, and Actuate's motion for leave to amend is granted in part and denied in part.

BACKGROUND

　　　Actuate owns and licenses software developed to meet the needs of large business enterprises.  CS is engaged in the

manufacture of specialty architectural products. Actuate offers licenses for use of its software on a "per CPU" basis for unlimited users or on a "Named User" basis for a specified number of users. A CPU is defined as a single core of a single processor on a single machine.

On May 21, 1999, CS purchased, for the first time, a single CPU license for Actuate's software. Declaration of Dylan Boudraa in Support of Actuate's Opp. to CS's Mot. for Summ. J., ¶ 6. The license agreement, dated March 8, 1999, contained a "No copies" provision under section 1.03. Id. at ¶ 6 and Ex. B. It stated,

> **No copies.** Except as expressly allowed by the terms of this license, You shall not copy or modify any portion of the Software other than that You may make (1) copy of the computer program portion of the Software solely for archival or backup purposes.

Id. at Ex. B.

On September 13, 2000, CS purchased another CPU license, for a total of two. The software under both CPU licenses was installed on a single two-CPU server, referred to as the old production server. On March 17, 2004, CS obtained a new production server. On July 11, 2004, CS installed the Actuate software, residing on the old production server, onto the new one. Declaration of Craig S. Hilliard in Support of CS's Mot. for Summ. J., Ex. J, Forensic Analysis Summary Report.

Licensing agreements dated July 13, 2003 and June 10, 2004 applied to the Actuate software on the new production server through the remainder of 2004. The "No copies" provision in section 1.03 in both agreements was the same as that quoted above. Boudraa Dec., Exs. E and F. Actuate concedes that section 1.03 of

2

the license agreements "remained relatively unchanged" from May 21, 1999 to May 15, 2005. Boudraa Dec. at ¶ 8. For the purpose of this motion, the agreements with the identical section 1.03 are referred to as the Version Seven agreement.

CS does not dispute that on July 12, 2005, it upgraded its Actuate software to Version 8SP1. At the time of the upgrade, CS accepted a license agreement dated May 15, 2005. Section 1.4 of the agreement required that,

> Prior to the initial installation of any Software, You shall notify Actuate in writing in accordance with the procedure set forth at http://www.actuate/license of the model name and number, location, CPU speed, and CPU type of the server on which any server component of the Software is to be installed. Once installed, You must obtain Actuate's written consent before You move any Software from any CPU to another CPU, which may be subject to a CPU upgrade transfer license fee . . . If Actuate grants its consent, You may reinstall the Software on the new CPU on the condition that You delete the Software from the previous CPU within five (5) days of successful installation.

Boudraa Dec., Ex. F.

However, Actuate has not produced any evidence that, at any time after July 12, 2005, CS moved its software from one CPU to another, such that it would have been required to pay a license transfer fee pursuant to the software licensing agreement.

On October 1, 2010, Actuate filed suit against CS, alleging causes of action for copyright infringement and for breach of contract. It alleged that it held rights and title to federally registered copyrights covering its Actuate 10 software and earlier versions thereof. Compl. at ¶ 9. Although Actuate's complaint alluded to the existence of multiple licensing agreements with CS over the years, the sole licensing agreement discussed in detail

3

in the complaint was the May 15, 2005 agreement that pertained to Version 8SP1 of Actuate's software.[1]

Actuate alleged that CS breached the terms of the "License Agreement" by:

- Authorizing and/or distributing content generated by the Copyrighted Work to 687 users of various capacities, well in excess the 6 Named User licenses it had purchased;

- Operating the Copyrighted Work on an unlicensed CPU;

- Transferring the Copyrighted Work from one server to another without paying for license transfer fees specified in the License Agreement;

- Making unauthorized copies of the Copyrighted Work;

- Installing at least one update without paying the required maintenance fees as provided under the License Agreement.

Compl. at ¶ 16.

The complaint's copyright infringement claim alleges that CS reproduced, displayed, and distributed unauthorized copies of Actuate's copyrighted work, and that such unauthorized copies and use exceed the permissible license terms. Compl. at ¶ 21. Likewise, Actuate alleges that CS committed a breach of contract by using the copyrighted work and authorizing or distributing content generated by the copyrighted work without authorization under the licensing agreement. Compl. at ¶ 28.

---

[1] The complaint indicates that the "License Agreement" was attached as Exhibit A, but the exhibit was not actually attached to the complaint faxed to the Court and electronically filed in the docket. The May 15, 2005 Version 8SP1 agreement, as well as earlier license agreements concerning prior versions of the software, were attached to Actuate's proposed amended complaint.

4

DISCUSSION

I. Motion for Partial Summary Judgment

As noted earlier, CS moves for partial summary judgment, contending that Actuate lacks evidence to prevail on its claim based on a failure to pay a license transfer fee.

Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law. Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1288-89 (9th Cir. 1987).

The moving party bears the burden of showing that there is no material factual dispute. Therefore, the court must regard as true the opposing party's evidence, if supported by affidavits or other evidentiary material. Celotex, 477 U.S. at 324; Eisenberg, 815 F.2d at 1289. The court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991).

Material facts which would preclude entry of summary judgment are those which, under applicable substantive law, may affect the outcome of the case. The substantive law will identify which facts are material. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

CS's motion for partial summary judgment on Actuate's claim based on CS's alleged failure to pay a license transfer fee under

5

1  the Version 8SP1 agreement is granted.  A contract claim requires
2  an agreement between the parties.  However, no agreement to pay a
3  license transfer fee existed in 2004 when CS moved its Actuate
4  software from its old production server to its new production
5  server.  At the hearing on the motion, Actuate argued that its
6  copyright infringement claim is independent of its breach of
7  contract claim.  However, on the face of its complaint, both
8  claims turn on a breach of the licensing agreement.  Thus, because
9  partial summary judgment is granted in favor of CS as to Actuate's
10 contract claim, it is also granted as to the copyright claim,
11 because it too arises from CS's alleged failure to pay the license
12 transfer fee under the Version 8SP1 agreement.

II. Motion for Leave to Amend

    Actuate moves to amend its complaint to add the following
allegations: (1) Actuate violated the Version 8SP1 agreement by
"operating an unauthorized copy of the Copyrighted Work on a
backup data recovery server, running hot and in parallel to a
production server, without paying for the appropriate CPU
license," and (2) in mid-2004, CS violated the Version Seven
agreement by transferring its Actuate software from one server to
another without paying any license transfer fees.

    Unlike the original complaint, the proposed amended complaint
includes copies of the license agreements covering CS's CPU's for
Version Seven of the Actuate software in 2004.  In addition, the
proposed second and third claims for relief specify that the
Version 8SP1 and Version Seven agreements are the basis for the
claims, respectively.

6

The Court's February 25, 2011 case management order set March 17, 2011, as the deadline for the addition of parties or claims to the lawsuit.

Pursuant to Federal Rule of Civil Procedure 16(b)(4), a scheduling order "may be modified only for good cause and with the judge's consent." Where a schedule has been ordered, a party's ability to amend its pleading is governed by this good cause standard, not the more liberal standard of Rule 15(a)(2). Johnson v. Mammoth Recreations, Inc., 975 F.2d 604, 608 (9th Cir. 1992). In order to determine whether good cause exists, courts primarily consider the diligence of the party seeking the modification. Id. at 609; see also Coleman v. Quaker Oats Co., 232 F.3d 1271, 1294 (9th Cir. 2000). Courts also consider five factors when assessing the propriety of a motion for leave to amend: undue delay, bad faith, futility of amendment, prejudice to the opposing party and whether the plaintiff has previously amended the complaint. Ahlmeyer v. Nev. Sys. of Higher Educ., 555 F.3d 1051, 1055 n.3 (9th Cir. 2009).

    A.    New "Backup Server" Claim Based on Version 8SP1 Agreement

Actuate's request to add its backup server claim is granted.

    1.    Diligence and Undue Delay

The discovery deadline has been extended multiple times pursuant to the parties' joint stipulations. Docket No. 19 (August 2, 2011 extension), Docket No. 21 (October 20, 2011 extension) and Docket No. 25 (March 8, 2012 extension). March 23, 2012 was the close of fact discovery.

7

On March 22, 2012, Actuate's expert, Keyur Dani, traveled to CS's offices to inspect its computers to determine how the company was using its software. Dani's report dated April 5, 2012, states that CS's "Backup Environment was running hot and in parallel to the Production Environment."

Actuate filed its motion for leave to amend on April 17, 2012. Although there were delays in the discovery process and in scheduling the server inspection, the inspection took place before the mutually agreed upon discovery deadline. Actuate acted diligently in filing the motion to leave to amend less than two weeks after the issuance of its expert report. Although Actuate could have been more diligent, its delay was not undue.

### 2. Bad faith

Actuate has not acted in bad faith in attempting to add a new allegation as to how the Version 8SP1 agreement was violated. Rather, Actuate is seeking to amend its complaint in light of what discovery has revealed.

### 3. Futility

CS does not argue that an amendment to add this allegation is futile. The Version 8SP1 agreement does have a provision that makes some allowance for a backup copy of the software, but the backup copy must be kept "separate from any actively used computer programs or documentation." Section 1.6 of 8SP1 Agreement.

### 4. Prejudice

CS argues that it will be prejudiced if Actuate is permitted to add its claim based on the back-up server because it would need discovery to address the claim and Actuate has yet to amend its interrogatories to inform it of the amount of damages at issue.

8

CS has possession of the computer servers, so it can easily conduct its own investigation. On the other hand, CS may need to depose the Actuate expert who wrote the report and to depose an Actuate Rule 30(b)(6) witness to learn about the potential damages at issue. Actuate has represented that it does not need further discovery and it could amend its interrogatory responses if necessary. Assuming that further discovery is required, it will be limited and could be conducted without affecting the trial date. Thus, the prejudice is not substantial.

Given that Actuate acted without undue delay, and the minimal prejudice to CS, Actuate's request to add its backup server claim based on the Version 8SP1 agreement is granted.

B.   New Claim as to the Version Seven Agreement

Actuate has not demonstrated that it should be permitted to add a claim based on the Version Seven agreement.

1.   Diligence and Undue Delay

On February 15, 2012, Christopher Meyer, head of CS's Network Operations Group, testified that Version Seven of the Actuate software was installed on the new production server on before July 20, 2004, most likely on July 11, 2004. Hilliard Dec. in Support of CS's Mot. for Summ. J., Ex. B, Meyer Dep., 37:5-41:22. CS engaged an expert to conduct a forensic analysis of its use of Actuate software before May 15, 2005. Id. at Ex. J, Forensic Analysis Summary Report. The expert report, dated April 5, 2012, states that a new production server was put into service on or around March 17, 2004, and that Version Seven was used on that server from July 20, 2004 through October 30, 2004. Id. at 5. As

noted earlier, Actuate filed its motion for leave to amend on April 17, 2012.

Although Actuate sought leave to amend soon after receiving CS's expert report, confirming Meyer's earlier testimony, it does not dispute that, even before the lawsuit was filed, CS informed it that a new server was installed in 2004. This was before the parties entered into the Version 8SP1 agreement. Actuate argues that CS's pre-litigation statement has no bearing on the operative allegation that its software was transferred without paying license fees. However, it is clear that the thrust of Actuate's lawsuit has been alleged violations of the Version 8SP1 agreement, not the earlier Version Seven agreement. If Actuate sought to show that CS breached the Version Seven agreement and committed copyright infringement under that agreement, it should have acted more diligently to bring the issue into this suit. On the face of the complaint, it is apparent that Actuate was aware that CS had not entered into the Version 8SP1 agreement until May 2005. Actuate could have acted much earlier to amend its complaint to add specific allegations as to the Version Seven agreement. Actuate's failure to do so demonstrates its lack of diligence and undue delay.

      2.    Bad Faith

Actuate's desire to add a claim based on a violation of the copying prohibition in the Version Seven agreement appears to be motivated by CS's meritorious motion for partial summary judgment on Actuate's license transfer fee claim based on the Version 8SP1 agreement. There is no reason that Actuate could not have developed this claim earlier in the litigation, and its argument

10

that it is seeking to add this claim based on the new expert report is not credible.

### 3. Futility

CS argues that the claim is futile because it is untimely in that the transfer occurred in 2004. The limitations period for contract and copyright claims are four and three years, respectively. The Court cannot determine whether the claim is stale because it depends on the application of the discovery rule, that is, when Actuate discovered or should have discovered the transfer. Thus, the claim is not clearly futile.

### 4. Prejudice

CS argues that it would be prejudiced by the amendment because it requires further discovery to address the statute of limitations and laches issues, as well as damages. Although Actuate argues that it was not in a position to know whether CS had upgraded its server or transferred software, it would be reasonable for CS to conduct discovery as to when Actuate knew or would have been in a position to know. The reopening of discovery would burden CS and extend the duration of this lawsuit against it.

Actuate's request to add a claim based on CS's purported unauthorized copying under the Version Seven agreement is denied due to its lack of diligence, undue delay, and the prejudice that would be imposed on CS if the claim were pursued at this late stage.

## CONCLUSION

CS's motion for partial summary judgment is granted. Actuate's motion for leave to amend is granted in part and denied

11

in part.  Actuate's request to add its backup server claim pursuant to the Version 8SP1 agreement is granted.  However, Actuate's motion to add a claim based on the Version Seven agreement is denied.

Actuate shall file its amended complaint, making only the changes authorized in this order, within four days.  The parties shall provide to the Court, within one week, a joint status update regarding the parties' scheduled mediation date and chosen mediator.  The parties shall conduct all necessary discovery on the new claim within twenty-eight days.  In the event that an additional dispositive motion is warranted, the motion shall be submitted within thirty-five days from the date of this order.  If additional discovery and motion practice do not delay the trial date, the parties shall appear for a final pretrial conference on August 22, 2012 at 2:00 pm.  Otherwise, the parties may seek a new trial date before the undersigned or consent to a trial before a magistrate judge.

IT IS SO ORDERED.

Dated: 6/8/2012

CLAUDIA WILKEN
United States District Judge